# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:22-cr-311 (RC) |
| v. | : | |
| | : | |
| JOHN DAVID ROSS GOULD, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John David Ross Gould to 30 days of incarceration, 36 months of probation, and $500 in restitution.

### I.      Introduction

The defendant, John David Ross Gould, a land surveyor in suburban Atlanta, Georgia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Gould pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

is appropriate in this case because Gould: (1) approached the Capitol building in the afternoon of January 6 despite observing flashbang grenades exploding, and tear gas choking the air; (2) entered the Capitol at approximately 2:15 p.m. through the Senate Wing Door, approximately two minutes after other rioters broke this door open and shattered nearby windows in the initial breach of the Capitol building; (3) spent approximately 40 minutes inside the Capitol during the riot; (4) joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; (5) joined another crowd that formed outside the House of Representatives Chamber that attempted to enter that Chamber while lawmakers were still trapped inside; (6) entered a sensitive space – the Samuel Rayburn Reception Room – and took a "selfie" in the midst of the riot, which he shared with at least one friend; (7) only left the Capitol after hearing that a rioter had been shot; and (8) minimized his conduct to the FBI when interviewed.

The Court must also consider that Gould's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, Gould's participation in a riot that succeeded in halting the Congressional certification combined with his extended parading within the Capitol renders a sentence of incarceration both necessary and appropriate in this case.

## II.     Factual and Procedural Background

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at ¶¶1-7.

*Gould's Role in the January 6, 2021 Attack on the Capitol*

Gould traveled from his home in suburban Atlanta, Georgia to Washington, D.C. with his friend Jonathan Davis Laurens[2] and a second friend on January 5, 2021 to attend the "Stop the Steal" rally.  On January 6, Gould and his friends attended the rally at the Ellipse.  Gould wore a bright yellow shirt, green jacket, black facemask and a white cowboy hat that said, "Team Trump." After listening to the speakers, Gould and the crowd made their way to the Capitol, whereupon he and Laurens lost contact with their other friend.

Upon approaching the Capitol building on January 6, Laurens, who was with Gould at that time, reported hearing flashbang grenades and detecting tear gas in the air, later telling the FBI, it "was not fun to breathe in."  At 2:03 p.m., Metropolitan Police Department officers, responding to United States Capitol Police ("USCP") officers' calls for help, began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as

---

[2] Laurens pled guilty to 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating or Picketing in the Capitol Building) on February 2, 2022, for his participation in the Capitol riot.

crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.

Undeterred by these observations, Gould pressed forward. He went up the stairs from the west front to the Northwest Courtyard. He approached the Senate Wing Door at approximately 2:14 p.m., just one minute after the initial breach of the Capitol building at this location.



*Image 1*

Gould entered the Capitol building with Laurens through the Senate Wing Door at 2:15 p.m.:



*Image 2*

Gould turned right and entered the Capitol Crypt.  There, USCP officers had formed a line of officers blocking the rioters from advancing further into the building.  But rioters continued streaming into the Crypt, quickly outnumbering the officers and pushing past them.  Though not at the front, Gould formed part of this critical mass.

Gould proceeded into the Small House Rotunda and took stairs up to the Capitol's second level.  There, Gould walked through Statutory Hall to the Statuary Hall Connector.  In the Statuary Hall Connector, Gould joined yet another group of rioters outside the House Chamber as they attempted to gain access to the House Chamber where members of Congress were sheltering.  The door at the top center of the photograph below is the door to the House of Representatives Chamber.  Gould is in the white cowboy hat to the right of the circle:



*Image 3*

Although Gould was not at the front of this group, he was part of this particular mob, who were chanting "Stop the steal!" and "Break it down!" in reference to the House Chamber door.  On the other side of that door, USCP officers had barricaded the door and eventually drew their weapons as the rioters attempted to enter the Chamber with members of Congress inside:



*Image 4*

When the mob could not successfully breach the House Chamber Door, many, including

Gould, turned left and proceeded down a house corridor, as depicted below:



*Image 5*

At approximately 2:40 p.m., Gould entered a sensitive area, the Samuel Rayburn

Reception Room, where he took a "selfie" before a mirror hanging above a fireplace in that

room:



*Image 6*

The Rayburn Room is not open to the public and, even under normal circumstances, people are not allowed access to the Rayburn Room absent authorization from the House of Representatives or its rules.  *See* 40 U.S.C. § 5104(e)(2)(A).  Gould gleefully shared the photo with Laurens, texting it to him and asking, "Can you see me in the mirror?"  Gould exited the Rayburn Reception Room with Laurens at approximately 2:41 p.m. and moved in the direction of the Speaker's Lobby.  Gould exited the Capitol building through the Upper House Door at approximately 2:54 p.m., as depicted below:



*Image 7*



*Image 8*

In total, Gould spent approximately 40 minutes inside of the Capitol, taking photos as he paraded through.  Gould left the building and found Laurens outside.

*Gould's Interview*

On March 15, 2022, the FBI interviewed Gould. During the voluntary interview, Gould admitted his actions on January 6 but sought to minimize his motivation behind them. He told the FBI that a group of Capitol Police at one of the doors was letting people in, apparently proposing that entering the Capitol building was permissible after proceeding through tear gas and flashbangs, smashed windows, people trying to forcefully break down doors and the overwhelmed police. Gould told the FBI that once inside, he saw young individuals ramming doors and being antagonistic. Gould told the FBI those individuals did not look like they belonged with "us." Gould stated, "We were there to be peaceful. We just wanted to be heard." Gould told the FBI he only left the Capitol after another rioter yelled that a woman had just been killed. Gould stated he observed a lot of people there to agitate and the rioters "wanted to be heard but no one was listening."

*The Charges and Plea Agreement*

On March 11, 2022, John David Ross Gould was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 15, 2022, he was arrested in Norcross, Georgia. On September 16, 2022, the United States filed an Information charging Gould with the same four counts. On December 5, 2022, pursuant to a plea agreement, Gould pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, Gould agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Gould now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Gould faces up to six months of

imprisonment, up to five years of probation, and a fine of up to $5,000. Gould must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of incarceration and 36 months of probation.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gould's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gould, the absence of violent or destructive acts is not a mitigating factor. Had Gould engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Gould's case is the timing of his entry into the Capitol and the spaces throughout.  Gould entered the Capitol building through the Senate Wing Door just two minutes after rioters violently breached the building for the first time that day.  As Gould approached the door, he would have observed the windows were broken and an alarm would have

11

been audible.  After entering, he observed people ramming doors and being antagonistic.  Still, he proceeded further into the building.  Gould was part of a mob in which individuals were chanting "Stop the steal!" and "Break it down!" in reference to the House Chamber door, which had been barricaded by USCP officers on the other side of the door protecting members of Congress who were still inside the Chamber.   He entered a sensitive space (the Rayburn Room) that would not be open to the public even under normal circumstances, let alone during a violent riot.  Additionally, Gould's assertion that the overrun police had allowed rioters in the Capitol is an affront to the hundreds of officers injured that day preventing exactly that.  Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration.

### B.  Gould's History and Characteristics

As set forth in the PSR, Gould has a history of employment and a minor criminal history. ECF No. 33, ¶¶ 44-49, 25-27. He appears to have been compliant with his conditions of pre-trial release.  *Id.* at ¶ 38.   His prior involvement with the criminal justice system includes a Driving Under the Influence arrest in 1995 for which he was fined and given six months of probation, *Id.* at ¶ 25, and a 2007 arrest for Obstruction of an Officer, for which he was sentenced to 12 months' probation and a fine.   Considering his criminal history and acceptance of the plea offer, the government requests only a short period of incarceration and a probationary term.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### 1. General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think

that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

2.      *Specific Deterrence*

Gould's persistence in claiming that he was allowed to enter the Capitol on January 6 (as expressed during his interview with the FBI); his conduct on January 6, 2021, which included entering a sensitive aera of the Capitol building; his proximity to those using violence in an attempt to stop the certification; and his minimization of his own conduct show the need for specific deterrence for this defendant.

**E.   The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Gould based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gould has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors

---

[3] A routinely-updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances and defendant characteristics present here, *United States v. Jonathan David Laurens*, D.D.C. 21-cr-450 (RC) is analogous.  Gould and Laurens spent much of their time in the Capitol together, with Gould exiting approximately 4 minutes after Laurens.  In that case,

this Court sentenced Laurens to 60 days' home detention and 12 months' probation.  *See* 21-cr-450 (RC), Dkt. No. 34.

The Court may also consider *United States v. Oliver Sarko*, 21-CR-591 (CKK).  In *Sarko*, defendant Sarko also pled guilty to a violation of 18 U.S.C. § 5104(e)(2)(G).  Similar to Gould, Sarko observed rioters entering the Capitol building violently; documented his time at the Capitol (made videos); and entered sensitive space while inside (specifically, Senator Merkley's office and a lounge used by spouses of representatives/senators).   Judge Kollar-Kotelly sentenced Sarko to 30 days' incarceration and 36 months' probation.

Additionally, in *United States v. Jeremey Baouche*, 21-CR-733 (CRC), defendant Baouche also pled guilty to a violation of 18 U.S.C. § 5104(e)(2)(G).  Similar to Gould, Sarko entered the Capitol building despite red flags (alarms were going off); entered a sensitive area (a hallway near the Senate Wing); and did not show genuine remorse.  Distinct from Gould, Baouche did use a megaphone to lead a crowd in chants; however, Baouche only remained in the Capitol building for 17 minutes, while Gould remained inside for approximately 40 minutes.  Judge Cooper sentenced Baouche to 30 days' incarceration and 24 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [4]

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence John David Ross Gould to 30 days

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

of incarceration, 36 months of probation, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov

</div>